PAUL LEWIS BROWNING, Appellant, *v.* THE STATE OF NEVADA; WARDEN, ELY STATE PRISON, E.K. McDANIEL and FRANKIE SUE DEL PAPA, ATTORNEY GENERAL FOR THE STATE OF NEVADA, Respondents.

No. 39063

June 10, 2004 91 P.3d 39

*JoNell Thomas,* Las Vegas; *Heller Ehrman White & McAuliffe LLP* and *Jason B. Isaacs,* San Diego, California; *Heller Ehrman White & McAuliffe LLP* and *Warrington Samuel Parker III,* San Francisco, California, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *Clark A. Peterson,* Chief Deputy District Attorney, and *H. Leon Simon,* Deputy District Attorney, Clark County, for Respondents.

Before SHEARING, C. J., ROSE and MAUPIN, JJ.

## OPINION

*Per Curiam:*

In 1985, appellant Paul Lewis Browning robbed and stabbed to death Hugo Elsen at Elsen's jewelry store in Las Vegas. Browning was convicted of murder and sentenced to death. This is his timely first petition seeking post-conviction relief, pursuant to former NRS 177.315-.385 (equivalent to a post-conviction habeas petition). The district court denied the petition, finding that Browning received effective assistance of counsel and that his other claims were procedurally barred.

This appeal raises numerous claims. The primary issue is whether Browning's appellate counsel was ineffective for failing to challenge the aggravating circumstance of depravity of mind. We conclude that counsel was ineffective in this regard, requiring us to vacate Browning's death sentence and remand for a new penalty hearing. We otherwise affirm the district court's order.

## FACTS

On November 8, 1985, Hugo Elsen was stabbed to death during a robbery of his jewelry store in Las Vegas. His wife, Josy Elsen, was in the back of the store when he was attacked. Hearing noises, she went into the showroom and saw a black man wearing a blue cap squatting over her husband holding a knife. She fled out the back door to the neighboring store and asked the employees there to call the police. She and a neighboring employee, Debra Coe, then returned to the jewelry store where Coe placed a pillow under Elsen's head and covered him with a blanket. Two to four minutes later help arrived. Elsen soon died, after giving a very brief description of the perpetrator as a black man wearing a blue cap with loose curled wet hair. Debra Coe also described a man she had seen leaving the vicinity: he was wearing a blue cap, blue jacket, Levi's, and tennis shoes; was about 27 years old and about six-feet tall; and had hair a little longer than the cap he was wearing and a mustache. Another witness, Charles Woods, identified a person he saw leaving the vicinity as a black man wearing a dark or blue cap and dark trousers, about six-feet tall, and weighing about 180 pounds.

Shortly after the crimes, Randy Wolfe approached police and told them that a man was in Wolfe's nearby hotel room with a large amount of jewelry. The police went to the room and found Browning with the jewelry. Browning was arrested and taken to Coe and Woods for a showup identification. They identified Browning as the man they saw leaving the vicinity of the crimes.

At trial, Vanessa Wolfe, Randy Wolfe's wife, testified for the State to the following. She returned to her hotel room on the day of the crimes and found Browning taking off his clothes. He had a coat, which was either on the floor or on the bed. On the bed was a lot of jewelry with tags, which she helped cut off. Browning asked Vanessa to help him get rid of some of the jewelry and said he thought he had just killed somebody. She helped Browning by throwing the tags and his hat in a nearby dumpster. Browning gave her a knife to dispose of. Instead, she put the knife in a pizza box in a closet under the stairs. The officers assigned to Browning's case testified that they retrieved all of this evidence from the places that Vanessa described. Randy Wolfe also testified that when he went into his hotel room, Browning was sitting on the

bed and said that he just robbed a jewelry store and thought that he had killed a man. Investigators found Browning's fingerprints in the jewelry store.

Browning was convicted, pursuant to a jury trial, of first-degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon, burglary, and escape. At the penalty hearing, the State presented detailed evidence of his prior felonies for robbery with the use of a knife. Browning's mother testified as a mitigating witness. She stated that Browning attended private school as a child, was a very good student and president of the student council, and was very athletically inclined, winning medals in cross-country. She had marital problems, and she and Browning moved to Washington, D.C., where he worked as a doorman for the United States Congress and took paralegal classes at the Library of Congress. After Browning left high school, she had not had much contact with him, but she knew that he was very remorseful for the crimes. Browning spoke in allocution and stated that his involvement with drugs was the reason he was implicated in the crimes. He apologized for the pain that the Elsen and Browning families had suffered. He stated that he did not want to die and that he was innocent.

The jury found five aggravating circumstances: the murder was committed while Browning was engaged in a burglary; the murder was committed while he was engaged in a robbery; he was previously convicted of a felony involving the use or threat of violence; the murder was committed while he was under a sentence of imprisonment; and the murder involved depravity of mind. The jury did not find any mitigating circumstances and returned a sentence of death.

This court affirmed Browning's conviction and sentence.[1] In May 1989, he timely filed his first petition for post-conviction relief. He filed a supplemental petition the next month. In June 1996, he filed an amended petition, and in October 1999, he filed a revised second amended petition. The district court conducted an evidentiary hearing in 1999 and dismissed the petition on December 7, 2001.[2] This appeal followed.

## DISCUSSION

*Applicable legal standards for review of this case*

A petitioner for post-conviction relief is entitled to an evidentiary hearing only if he supports his claims with specific factual al-

---

[1]*Browning v. State,* 104 Nev. 269, 757 P.2d 351 (1988).

[2]It is unclear from the record why Browning's petition lingered in the district court for nearly twelve years.

legations that if true would entitle him to relief.[3] He is not entitled to such a hearing if the factual allegations are belied or repelled by the record.[4] The petitioner has the burden of establishing the factual allegations in support of the petition.[5] Also, an appellant must "present relevant authority and cogent argument; issues not so presented need not be addressed by this court."[6]

A claim of ineffective assistance of counsel presents a mixed question of law and fact, subject to independent review.[7] To establish ineffective assistance of counsel, a claimant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense.[8] To show prejudice, the claimant must show a reasonable probability that but for counsel's errors the result of the proceeding would have been different.[9] Judicial review of a lawyer's representation is highly deferential, and the claimant must overcome the presumption that a challenged action might be considered sound strategy.[10] To establish prejudice for a claim of ineffective assistance of appellate counsel, the claimant must demonstrate that an omitted issue would have had a reasonable probability of success on appeal.[11]

## Ineffective assistance of trial counsel

Browning claims first that his trial counsel failed to properly investigate the facts of this case. Browning largely fails to specify what evidence would have been revealed by additional investigation and how the lack of any evidence prejudiced him. He does claim that counsel failed to investigate the possibility that a Cuban man committed the crimes, but this claim is without merit. At the evidentiary hearing, trial counsel stated that the defense theory was that a Cuban man, a friend of the Wolfes', committed the crimes. Counsel sent his investigator to the streets to find out anything he could about this man. In addition, counsel presented a witness at trial who testified that he saw a Cuban man walking down the street near the crime scene around the time of the crimes.

[3]*Hargrove v. State,* 100 Nev. 498, 502, 686 P.2d 222, 225 (1984).

[4]*Id.* at 503, 686 P.2d at 225.

[5]*Bejarano v. Warden,* 112 Nev. 1466, 1471, 929 P.2d 922, 925 (1996).

[6]*Maresca v. State,* 103 Nev. 669, 673, 748 P.2d 3, 6 (1987); *see also* NRAP 28(a)(4) (requiring a party's argument to contain "citations to the authorities, statutes and parts of the record relied on").

[7]*Kirksey v. State,* 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996).

[8]*Id.* (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)).

[9]*Id.* at 988, 923 P.2d at 1107.

[10]*Strickland,* 466 U.S. at 689.

[11]*Kirksey,* 112 Nev. at 998, 923 P.2d at 1113-14.

Browning contends that his counsel was ineffective in failing to rebut the State's theory that Browning committed the robbery to bail his girlfriend, Marcia Gaylord, out of jail so she could prostitute herself and give him the proceeds to purchase drugs. Browning claims that counsel failed to present Gaylord's jail records showing that she was not in jail at the time of the crimes. At trial, counsel challenged the State's theory of motive, arguing to the jury that there had been "no testimony by a custodian of records or anyone from the Clark County Detention Center that Marcia Gaylord was in custody." The prosecution countered that it had presented other testimony that she was in jail. We conclude that even if counsel could have proven that Gaylord was not in jail on the afternoon of the crimes, Browning does not show that he was prejudiced. He concedes that Gaylord was released from jail only that morning. Moreover, Browning's precise motive for the crimes was not crucial to the State's case.

Next, Browning claims that trial counsel failed to interview several key witnesses, including Officer Gregory Branon, the first officer on the crime scene. Officer Branon testified at trial that he received from the dying Elsen a description of the killer as a "black male adult in his late twenties, wearing a blue baseball cap, . . . and hair described as a shoulder length jeri-type curl." But Browning's hair was not a jeri-curl when he was arrested a short time later. In closing argument, the prosecutor argued that it was understandable if a white person, such as the victim, incorrectly used the term "jeri-curl" to describe Browning's hair. However, at the evidentiary hearing, Officer Branon, who is black, testified that the term "jeri-curl" was his own, based on Elsen's description of the perpetrator's hair as loosely curled and wet. Browning argues that his trial counsel was ineffective in not discovering this information, which would have refuted the prosecutor's closing argument and shown that the victim's description of the perpetrator's hair did not match Browning's.

We conclude that trial counsel was deficient here but that this deficiency alone was not prejudicial. The issue of Browning's hairstyle was extensively explored at trial. Elsen was the only person who described the hair protruding from Browning's hat as loosely curled and wet. Mrs. Elsen stated that it simply "puffed out in the back" of his cap. Coe testified that Browning's hair stuck out about an inch below his cap. The showup identification was the first time that witnesses viewed him without his hat. Coe testified that at the showup she could tell that Browning had just taken a cap off because his hair was matted down. Given this evidence and the overall strong evidence of Browning's guilt, we conclude that there

is no reasonable probability of a different result if counsel had discovered and presented the evidence that "jeri-curl" was the officer's term, not the victim's.

Browning also contends that his trial counsel was ineffective in failing to learn that bloody shoeprints near Elsen were already present when Officer Branon arrived at the crime scene. Because the prints did not match Browning's shoes and could not have been left by paramedics, who arrived after Officer Branon, Browning argues that this information indicated that another person committed the murder. We conclude that this information was not material and that trial counsel acted reasonably. Counsel explained at the evidentiary hearing that once he determined that the shoeprints did not match Browning's shoes, he chose not to investigate the prints further. He feared that investigation might establish that the prints had been left by police or paramedics, rather than some unidentified person. As long as the source of the prints was unknown, counsel could argue to the jury that the actual murderer had left them. Although it is now evident that the prints were present before police and paramedics arrived, counsel's basic reasoning remains sound because the bloody shoeprints were likely left by Mrs. Elsen and/or Coe, who were with Elsen before the first officer arrived. Counsel made a reasonable, tactical decision to leave the source of the prints uncertain.

Next, Browning claims that counsel should have interviewed Randy and Vanessa Wolfe, the State's key witnesses. Counsel testified that to avoid becoming a witness himself, he had a policy of not personally interviewing witnesses. Instead, he had his investigator conduct all interviews. This is a reasonable tactic. The investigator gathered enough information to permit trial counsel to adequately cross-examine the Wolfes on their version of events, their drug usage, their informer status, their lying, and their convictions and arrests. Therefore, Browning has failed to show that counsel was ineffective.

Browning complains that his counsel also failed to interview Mrs. Elsen, the victim's wife. According to Browning, Mrs. Elsen would likely have admitted that she could not identify her husband's assailant, enabling counsel to demonstrate that her in-court identification was unreliable. This claim lacks merit. Mrs. Elsen was asked on one occasion to identify Browning in a photographic lineup shortly after the crimes occurred. She was unable to do so; however, at trial she identified Browning as her husband's at-

tacker.[12] She qualified this identification by stressing that she only saw the perpetrator from the side. She did state that the attacker was a black man wearing a blue cap. Although counsel did not personally interview Mrs. Elsen, he adequately cross-examined her regarding the identification. After she made her in-court identification, counsel specifically asked the court to note for the record that Browning was the only black man in the room and that he was seated at the defense table. In addition, counsel pointed out during closing argument that although Mrs. Elsen could not identify Browning at the photographic lineup a month after the crimes, one year later she somehow identified him. Finally, the result if counsel had interviewed Mrs. Elsen is completely speculative, and this speculation does not demonstrate any prejudice.

Browning also claims that trial counsel was ineffective for failing to move to exclude Mrs. Elsen's in-court identification of Browning. On direct appeal, this court ruled that although Mrs. Elsen failed to identify Browning before trial, the in-court identification was admissible.[13] Therefore, Browning cannot demonstrate prejudice because the underlying claim has already been considered and rejected by this court.

Next, Browning asserts that counsel failed to properly cross-examine and impeach witness Debra Coe. Shortly after the crimes, the police brought Browning to Coe to determine if he was the man she had seen jogging by her window away from the crime scene. She said that Browning looked like the man but that she was not positive. At trial she stated that she was sure that the man was Browning. She also initially told police that all blacks look the same; however, at trial she stated that she was joking and did not think that all blacks looked the same. Browning claims that counsel inadequately cross-examined Coe by failing to ask her if the man she saw had any blood on him or was carrying any jewelry cases and why she thought that all blacks look alike. This claim lacks merit. Counsel unsuccessfully sought to suppress Coe's identification of Browning at trial. During cross-examination of Coe, counsel asked her many questions regarding her identification of Browning and whether she believed that all blacks looked alike. Browning has not demonstrated that counsel's cross-examination of

[12]In the opening brief, Browning's counsel make a misleading claim. The brief states that ''there were 18 pretrial hearings during which [Mrs. Elsen] was present, and where Mr. Browning was present. At trial, notwithstanding her repeated inability to identify the perpetrator,'' she was able to identify Browning. Although Mrs. Elsen was present at all or most of these hearings, the record does not reflect that she was ever asked to identify Browning at any of them.

[13]See Browning, 104 Nev. at 274, 757 P.2d at 354.

Coe was deficient or that there is a reasonable probability of a different result if counsel had asked if the man she saw was bloody or was carrying jewelry cases.

Browning contends that trial counsel was ineffective for failing to object to two references by the prosecution to Browning's prior criminal activity. First, Browning claims that counsel should have objected to admission of a mug shot, which allowed the jury to infer that Browning had been involved in prior criminal activity. We conclude that the photo had no appreciable prejudicial effect since jurors had no reason to assume that it had been taken in any other case but the one for which Browning was being tried. Second, Browning claims that trial counsel should have objected during closing argument when the prosecutor referred to Browning's involvement with drug use and said that his "girlfriend prostituted for him." Randy Wolfe had testified that Browning asked Wolfe to "cop" him some heroin. Wolfe also commented on Gaylord's involvement in prostitution; however, trial counsel objected, and the district court struck the statement. Therefore, although the prosecutor's comment on Browning's drug use was based on a fact in evidence, there was no evidence that Browning was involved in the crime of pimping or pandering prostitution. Such an improper reference to criminal history may violate due process,[14] and counsel should have objected. Nevertheless, we conclude that given the extensive evidence of Browning's guilt, this reference alone was not prejudicial.

Browning asserts that trial counsel failed to address the State's evidence that Browning's fingerprints were found in the jewelry store. This claim lacks merit; counsel did address this evidence. He cross-examined all of the State's experts on fingerprints. He specifically asked how long fingerprints remain on a surface in order to establish that the presence of Browning's prints did not necessarily mean that he was in the store on the day of the murder. Browning also claims that counsel should have consulted a fingerprint expert before trial but fails to explain how such a consultation would have aided his defense.

Browning complains that his counsel failed to object to the prosecutor's disparagement of the presumption of innocence. On direct appeal this court "denounce[d] the state's reference to the 'presumption of innocence' as a farce," but concluded that this act did not justify reversal.[15] We conclude that Browning was not prejudiced by counsel's failure to object.

---

[14]*See Manning v. Warden,* 99 Nev. 82, 86-87, 659 P.2d 847, 850 (1983).

[15]*Browning,* 104 Nev. at 272 n.1, 757 P.2d at 353 n.1.

Browning also claims that counsel should have objected to the jury instruction on reasonable doubt as constitutionally inadequate. He cites *Cage v. Louisiana*[16] and *Bollinger v. State*[17] but ignores *Lord v. State*,[18] where this court determined that the Nevada reasonable doubt instruction at issue and the instruction given in *Cage* were distinguishable and that the Nevada instruction was constitutional. Thus, counsel was not ineffective.

Browning claims that counsel failed to object to improper "vouching" by the prosecutor of Mrs. Elsen's identification of Browning. During closing argument, the prosecutor stated that her identification was "as good as you could ask for." Browning claims that in its answer below the State conceded that Mrs. Elsen never positively identified Browning. He asserts that the prosecutor's statements were severely prejudicial because Mrs. Elsen was the only person who placed Browning in the jewelry store at the time of the murder. This claim is without merit. The prosecution may not vouch for a witness; such vouching occurs when the prosecution places " 'the prestige of the government behind the witness' " by providing " 'personal assurances of [the] witness's veracity.' "[19] The remarks here did not amount to improper vouching. The prosecution did not place the prestige of the government behind Mrs. Elsen or provide personal assurances of her veracity. The prosecutor merely commented on Mrs. Elsen's identification, which she herself admitted was limited because she only saw the perpetrator from the side. Thus, counsel had no basis to object to the prosecutor's remarks.

Browning contends that counsel should have objected to the prosecutor's comments on the defense's failure to call Browning's girlfriend Gaylord as a witness. (He also claims that trial counsel should have requested a missing witness jury instruction, but provides no authority.) During closing argument, trial counsel stated, "I recall no testimony by a custodian of records or anyone from the Clark County Detention Center that Marcia Gaylord was in custody." The prosecutor responded in rebuttal that Randy Wolfe had testified that Gaylord was in jail and that defense counsel "has the capability of subpoenaing anyone he wants to. He could

---

[16]498 U.S. 39 (1990).

[17]111 Nev. 1110, 1115, 901 P.2d 671, 674 (1995).

[18]107 Nev. 28, 38-40, 806 P.2d 548, 554-56 (1991).

[19]*U.S. v. Kerr,* 981 F.2d 1050, 1053 (9th Cir. 1992) (quoting *U.S. v. Roberts,* 618 F.2d 530, 533 (9th Cir. 1980)).

bring in those jail records. He could bring in Marcia Gaylord. Sure not my witness. Sure wasn't here to testify in this particular trial.'' This response went too far because the defense had tried to subpoena Gaylord, but after a continuance of the trial due to the prosecutor's calendaring mistake, the defense could not locate Gaylord. Here, the prosecutor should have responded by simply stating that he did not need to produce the jail records because a witness had testified that Gaylord was in jail. It was improper for him to point out that the defense had not called Gaylord. Generally, a prosecutor's comment on the defense's failure to call a witness impermissibly shifts the burden of proof to the defense.[20] However, as discussed above, the issue of exactly when Gaylord was released from jail was not significant, and we conclude that counsel's failure to object to the prosecutor's comment was not prejudicial.

Browning complains that counsel failed to object during the guilt phase to the prosecutor's use of a photo of Elsen, the victim, with a small child on his lap. Browning contends that this picture amounted to victim impact evidence and was therefore improper during the guilt phase. He has provided no authority to support this contention, and we discern nothing prejudicial or inflammatory about the photo. It was reasonable for counsel not to object.

Next, Browning claims that counsel's failure to have Browning testify was prejudicial because he was the only witness that could explain why his fingerprints were in the jewelry store given Gaylord's unavailability. He contends that the need to explain this evidence outweighed the concern that he would be cross-examined regarding his prior convictions. This claim is without merit. '' 'Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.' ''[21] Counsel can advise a defendant whether it is wise for him to testify, but ultimately the decision lies with the defendant.[22] At trial, the district court advised Browning of his right to testify, and Browning waived that right upon the advice of counsel. Counsel then stated that he had advised Browning not to testify unless he could do so without being subject to examination concerning his prior robbery convictions. In addition, trial counsel stated at the evidentiary hearing that he advised Browning

---

[20]See Whitney v. State, 112 Nev. 499, 502, 915 P.2d 881, 882-83 (1996).

[21]Ingle v. State, 92 Nev. 104, 106, 546 P.2d 598, 599 (1976) (quoting Harris v. New York, 401 U.S. 222, 225 (1971)).

[22]See id.

not to testify, but it was ultimately Browning's decision, and Browning decided not to. Thus, counsel was not ineffective for failing to have Browning testify at trial because Browning, not counsel, made the decision. Moreover, counsel gave a valid reason why he advised Browning not to testify, and there is no indication that Browning's decision was unknowing or coerced.

Browning asserts that trial counsel failed to exclude five jurors for cause during voir dire even though they were victims of crimes similar to the crimes here. The five were victims of car or home burglaries, and all told the court that they were able to be fair and impartial despite their experiences as crime victims. Browning has not shown that counsel acted ineffectively.

Browning contends that trial counsel should have presented a defense of duress to the charge of escape. He claims that he was under duress immediately after he was arrested because of a police officer's threatening comments and cold conditions in the interrogation room. Apparently, Browning was shirtless and handcuffed to a pole below an air conditioning vent, and an officer allegedly told him that "when you are busted for murder in Nevada the case is closed." Browning picked the lock on his handcuffs, left the third-floor room, and proceeded downstairs to the door leading outside, where he was caught. Under NRS 194.010(7), duress requires a reasonable belief that one's life would be endangered or that one would suffer great bodily harm. The air conditioning and the officer's alleged comment do not constitute cause for such a belief. Moreover, this court has held that duress is not applicable to an escape charge; rather the proper defense is one of necessity, which requires the following five conditions: the prisoner is faced with a specific, imminent threat of death, forcible sexual attack, or substantial bodily injury; there is no time to complain to authorities, or there is a history that such complaints are futile; there is no time or opportunity to resort to the courts; no force or violence is used toward prison personnel or innocent persons during the escape; and the prisoner immediately reports to the proper authorities after obtaining a position of safety.[23] The facts here also do not support a necessity defense, and counsel reasonably presented neither defense.

Finally, Browning claims in a footnote that trial counsel was ineffective for failing to perform more precise testing of the State's blood evidence. He has not provided any cogent argument, legal analysis, or supporting factual allegations; thus, this claim warrants no consideration.

[23]*Jorgensen v. State,* 100 Nev. 541, 543-44, 688 P.2d 308, 309-10 (1984).

*Ineffective assistance of appellate counsel*

*The depravity-of-mind aggravator*

Browning claims that he was denied effective assistance of counsel on direct appeal in several ways. One claim has merit: appellate counsel failed to challenge the jury instruction defining the aggravating circumstance of depravity of mind. The instruction read:

> [D]epravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

There was no jury instruction regarding torture or mutilation.

The instruction given in this case failed to properly define the term "depravity of mind."[24] Absent a proper limiting instruction, "depravity of mind" fails to provide the required constitutional guidance to jurors.[25] We therefore construed the relevant statute, former NRS 200.033(8),[26] to require torture, mutilation or other serious physical abuse "beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind."[27]

At the time of Browning's trial, this court had not yet deemed the depravity-of-mind instruction unconstitutional; however, the United States Supreme Court had already deemed a very similar instruction unconstitutional in *Godfrey v. Georgia*.[28] The Supreme Court declared that a state "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty" and "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.' "[29] The Court concluded that the phrase "outrageously or wantonly vile, horrible and inhuman" did not imply an inherent restraint on the arbitrary and capricious infliction of the death sentence because any person could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman."[30]

---

[24]*Smith v. State,* 110 Nev. 1094, 1103-04, 881 P.2d 649, 655-56 (1994).

[25]*See, e.g., id.*

[26]The Legislature amended NRS 200.033(8) in 1995, deleting "depravity of mind" as an element. 1995 Nev. Stat., ch. 467, § 1, at 1491.

[27]*Robins v. State,* 106 Nev. 611, 629, 798 P.2d 558, 570 (1990).

[28]446 U.S. 420, 428-29 (1980).

[29]*Id.* at 428 (footnote citations omitted).

[30]*Id.* at 428-29.

In two opinions that preceded Browning's conviction, this court considered challenges to Nevada's depravity-of-mind aggravator based upon *Godfrey*: *Neuschafer v. State*[31] and *Rogers v. State*.[32] In both cases this court concluded that *Godfrey* was distinguishable and that the Nevada statute regarding depravity of mind was constitutional as applied.[33] Because a challenge based upon *Godfrey* was unsuccessful in these cases, the State argues that Browning's appellate counsel was not ineffective in failing to raise the issue. *Neuschafer* and *Rogers,* however, differed from Browning's case because in those cases the juries were instructed on torture as well as depravity of mind and in *Rogers* the jury was further instructed on mutilation, and this court concluded that the facts of those cases adequately supported the aggravating circumstance.[34] Here, the instruction given referred only to "depravity of mind" and plainly failed to provide adequate guidance to the jury under *Godfrey,* and there was no indication that Browning tortured or mutilated the victim.[35]

Because Browning's case resembled *Godfrey* more closely than did *Neuschafer* and *Rogers,* the failure of Browning's appellate counsel to challenge the depravity-of-mind instruction based upon *Godfrey* was objectively unreasonable. We also conclude that prejudice resulted because there is a reasonable probability this court would have recognized that the instruction was unconstitutionally vague, stricken the aggravator, and reversed Browning's death sentence.

Once an aggravator is stricken, this court either reweighs the aggravating and mitigating circumstances or applies a harmless error analysis.[36] In reweighing, this court disregards the invalid aggravat-

---

[31]101 Nev. 331, 705 P.2d 609 (1985).

[32]101 Nev. 457, 705 P.2d 664 (1985).

[33]*See Neuschafer,* 101 Nev. at 336-37, 705 P.2d at 612-13; *Rogers,* 101 Nev. at 467-68, 705 P.2d at 671-72.

[34]*Neuschafer,* 101 Nev. at 336-37 & n.2, 705 P.2d at 612-13 & n.2; *Rogers,* 101 Nev. at 467-68 & n.3, 705 P.2d at 671-72 & n.3. In *Neuschafer,* the victim was murdered by strangulation which snapped his neck back. 101 Nev. at 334, 705 P.2d at 611. In *Rogers,* the three victims were repeatedly shot and stabbed. 101 Nev. at 468, 705 P.2d at 671.

[35]The record reveals that Browning inflicted five superficial stab wounds and one fatal wound to the heart, which he penetrated three times without completely removing the knife from the victim's body.

[36]*Clemons v. Mississippi,* 494 U.S. 738, 741 (1990) ("[T]he Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review.").

ing circumstances and reweighs the remaining permissible aggravating and mitigating circumstances.[37] A harmless error analysis requires a new sentencing calculus to determine whether the error of the invalid aggravating circumstance was harmless beyond a reasonable doubt.[38] Either analysis asks the same question: is it clear that absent the erroneous aggravator the jury would have imposed death?[39]

In *State v. Haberstroh,* we recently concluded that the district court was correct that the depravity-of-mind aggravator was improperly found because the instruction at issue provided inadequate guidance to the jury, failing to limit the term "depravity of mind" in a constitutional manner.[40] Like this case, the State in *Haberstroh* did not allege torture or mutilation. Haberstroh presented no mitigating evidence, and four valid aggravators remained: the murder was committed during a robbery, a first-degree kidnapping, and a sexual assault, and Haberstroh was previously convicted of a felony involving the use or threat of violence. We nevertheless held that the weight of the remaining aggravators was not enough to convince us beyond a reasonable doubt that the jury would have returned a death sentence without the depravity-of-mind aggravator, especially since the prosecutor heavily emphasized the depravity of the murder.[41]

We are also not convinced beyond a reasonable doubt that the jury here would have returned a death sentence even without this aggravator. The jury found four other aggravators: the murder was committed while Browning was engaged in the commission of or an attempt to commit a burglary; the murder was committed while he was engaged in the commission of or an attempt to commit a robbery; he was previously convicted of a felony involving the use or threat of violence to the person of another; and the murder was committed while he was under a sentence of imprisonment. These remaining aggravators carry no more weight than those remaining in *Haberstroh*. And in closing argument the prosecutor stressed the aggravating circumstance of depravity of mind and invoked the language of the instruction defining the aggravator. He opened his argument by telling the jury that the human capacity "for evil and depraved behavior" made the death penalty necessary in this case. Later, after reading the instruction and describing the stabbing

---

[37]*State v. Haberstroh,* 119 Nev. 173, 183, 69 P.3d 676, 683 (2003).

[38]*Id.*

[39]*Id.* at 183, 69 P.3d at 682-83; *Leslie v. Warden,* 118 Nev. 773, 783, 59 P.3d 440, 447 (2002).

[40]119 Nev. at 182, 69 P.3d at 682.

[41]*Id.* at 183-84, 69 P.3d at 683-84; *cf. Valerio v. Crawford,* 306 F.3d 742, 758-63 (9th Cir. 2002) (concluding that the depravity-of-mind instruction at issue required a new penalty hearing).

death of Elsen, he said: "Is that wantonly vile, horrible, or inhuman? I suggest to you that's precisely what this instruction is talking about. This instruction is describing Paul Browning to a tee." And finally he argued that "the nature of the crime, and you can picture it in your mind, was wantonly vile as the instruction says."

We conclude therefore that there is a reasonable probability that on direct appeal a challenge to the depravity-of-mind aggravator would have succeeded. Thus, Browning was prejudiced by appellate counsel's failure to challenge it.

### Other claims of ineffective appellate counsel

Browning claims that appellate counsel was ineffective for failing to argue that prosecutorial misconduct vitiated Browning's presumption of innocence and the concept of reasonable doubt. He complains about prosecutorial statements regarding the presumption of innocence and the jurors' duty to convict, the prosecutor's reference to reasonable doubt, and a jury instruction on flight. Browning failed to provide argument, authority, specific allegations, or reference to the record regarding any comment on the jurors' duty or an instruction on flight, so these issues warrant no discussion.

The other aspects of this claim lack merit. Appellate counsel did assert numerous instances of prosecutorial misconduct on direct appeal, but this court deemed only two worth discussing and determined that "in light of the overwhelming evidence" of Browning's guilt there was insufficient prejudice to reverse.[42] Counsel raised the issue of the prosecutor's disparagement of the presumption of innocence, and this court denounced the misconduct but concluded that it did not justify reversal.[43] Browning argues that appellate counsel should have "federalized" the issue and gained a more favorable standard of review. This argument is unpersuasive: this court recognized that the presumption of innocence is a "fundamental and elemental concept . . . solidly founded in our system of justice," but still determined that the misconduct did not warrant reversal.[44] Browning claims that the prosecutor supplemented the reasonable doubt instruction by stating "so, don't anticipate answering all the questions in this case as a prerequisite to coming back with a guilty verdict. It has nothing to do whatsoever with reasonable doubt." This comment is certainly challengeable—some unanswered questions *are* pertinent to reasonable doubt—but did not violate our admonition to counsel not to "explain, elaborate on, or offer analogies or examples based on the statutory definition

---

[42]*Browning,* 104 Nev. at 272 & n.1, 757 P.2d at 353 & n.1.

[43]*Id.* at 272 n.1, 757 P.2d at 353 n.1.

[44]*Id.*

of reasonable doubt.''[45] Instead, the prosecutor basically argued ''that evidence and theories in the case before the jury either amount to or fall short of that definition,'' which is acceptable argument.[46]

Next, Browning claims that appellate counsel was ineffective for failing to challenge the admission of evidence of his thumbprint on a watch that was never linked to the crimes. We discern no prejudice. Even if it had been shown that his fingerprints were not found on any of the stolen jewelry, he was found in possession of the jewelry immediately after the crimes.

Browning claims that his appellate counsel was ineffective for failing to argue that the prosecutor committed misconduct by concealing benefits given to Randy Wolfe in exchange for his testimony. There is now evidence of such benefits, and we consider that matter below under *Brady v. Maryland*.[47] But counsel explored this issue at trial and was not ineffective.

Browning contends that appellate counsel failed to properly challenge the trial court's granting of a continuance. Though this issue was raised on appeal,[48] Browning asserts that counsel should have made several additional arguments. On appeal, this court concluded that ''in light of the overwhelming evidence of guilt presented against him at trial, it is clear that any alleged prejudice would not rise to the level justifying dismissal of the charged crimes.''[49] Browning's claim is without merit because he still fails to demonstrate prejudice.

Next, Browning claims that appellate counsel failed to challenge the escape instruction and to argue that the district court should have instructed the jury on attempted escape. Trial counsel asked for an attempted escape instruction as a lesser included offense because Browning never made it out of the police station. NRS 212.090 states that a prisoner is guilty of felony escape if he is ''confined in a prison, or . . . in the lawful custody of an officer or other person, [and] escapes or attempts to escape from prison or custody, if he is held on a charge, conviction or sentence of: 1. A felony.'' Browning picked the lock on his handcuffs and

---

[45]*Evans v. State*, 117 Nev. 609, 632, 28 P.3d 498, 514 (2001).

[46]*Id.*

[47]373 U.S. 83 (1963).

[48]*Browning,* 104 Nev. at 271, 757 P.2d at 352.

[49]*Id.*

escaped from the interview room. Although apprehended before he left the police station, he still escaped from where he was being detained. Therefore, the jury was properly instructed on the escape charge. Moreover, the escape statute encompasses attempted escape. Appellate counsel was not ineffective for failing to raise this claim on appeal because it had no reasonable probability of success.

Browning claims that appellate counsel failed to challenge the adequacy of the jury instruction on premeditation. We decline to consider this claim because it lacks any cogent argument, legal analysis, or specific factual allegations to support it.

Browning contends that appellate counsel should have argued that the trial court erred in failing to give the jury an addict-informer instruction regarding the Wolfes' testimony. He relies on *Champion v. State,* where this court held that it was plain error for the district court not to caution the jury regarding an addict-informer's testimony because such an instruction was central to the case.[50] *Champion* is distinguishable. In that case, the State conceded that the addict-informer was unreliable, and his testimony was the only evidence that the defendant had sold illegal drugs.[51] Here, the State has not conceded that the Wolfes were unreliable, and their testimony was corroborated by extensive evidence. Furthermore, the jury received a general cautionary instruction regarding the weight and credibility of witness testimony as well as one regarding the credibility of witnesses with felony convictions. The district court did not err by failing to give an addict-informer instruction; therefore, counsel was not ineffective for failing to raise this issue on direct appeal. Browning also claims that appellate counsel should have challenged the trial court's failure to give the jury a convicted felon instruction. However, the jury received such an instruction, and Browning does not explain how it was insufficient.

Next, Browning claims that appellate counsel failed to raise all instances of plain error, including the prosecutor's insertion of his personal beliefs, his references to facts not supported by the evidence, his comment on the defense's failure to call Gaylord as a witness, and his submission of victim impact evidence during the guilt phase. These claims lack any argument, legal analysis, or factual allegations to support them and do not warrant further discussion.

---

[50] 87 Nev. 542, 490 P.2d 1056 (1971).

[51] *Id.* at 543-44, 490 P.2d at 1057.

*Other claims*

### *Claims of prosecutorial misconduct*

Browning claims the prosecutor committed misconduct in several ways. Browning does not demonstrate good cause for failing to raise these issues on direct appeal or actual prejudice. Late in his opening brief, he claims that appellate counsel was ineffective for failing to raise acts of prosecutorial misconduct, but he fails to specify the acts. He does not connect his claim of ineffective counsel with the independent claims of prosecutorial misconduct. Moreover, many claims of misconduct were raised on direct appeal, but Browning has not identified which of his present claims were or were not raised previously. Among the claims of prosecutorial misconduct raised on direct appeal, this court only considered two worthy of discussion. In deciding those two claims this court stated, ''in light of the overwhelming evidence presented at the guilt phase of the trial, we cannot find the quantum of prejudice required to reverse.''[52]

Some other independent claims of prosecutorial misconduct, however, require some discussion. Browning claims that the prosecutor presented false evidence regarding blood found on Browning's coat, which was type B blood like the victim's. The prosecutor argued to jurors that the blood on the coat belonged to the victim, though he also conceded that other people have type B blood. DNA testing after the trial revealed that the blood was not the victim's. Because this is an independent claim of prosecutorial misconduct, Browning must demonstrate good cause for failing to raise it earlier and actual prejudice. Browning sought DNA testing of the bloodstain in November 1999. He does not attempt to establish good cause and explain why he did not raise the claim earlier.[53] But even if Browning could show good cause, he cannot demonstrate prejudice. Although the prosecutor was wrong that the blood belonged to the victim, the evidence he relied on was not false: the blood on the coat was the same type as the victim's. Therefore, no prosecutorial misconduct occurred. (But in assessing whether Browning's conviction remains sound, it is appropriate to consider the impact of this evidence and argument. We do so below.)

[52]*Browning,* 104 Nev. at 272, 757 P.2d at 353.

[53]Browning asserts for the first time in his reply brief that trial counsel was ineffective for failing to object to the prosecutor's assertions regarding the blood evidence and failing to seek further testing. NRAP 28(c) does not allow the raising of new claims in reply briefs; it limits a reply brief to addressing new matters raised in the answering brief.

Browning asserts that the prosecutor also committed misconduct by withholding exculpatory evidence in violation of *Brady v. Maryland*.[54] *Brady* requires a prosecutor to disclose evidence favorable to the defense when that evidence is material either to guilt or to punishment.[55] Evidence must also be disclosed if it provides grounds for the defense to impeach the credibility of the State's witness or to bolster the defense case.[56] "[T]here are three components to a *Brady* violation: the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material."[57] Absent a specific request for the evidence, "evidence is material if there is a reasonable probability that the result would have been different if the evidence had been disclosed."[58]

First, the prosecutor withheld information regarding benefits given to an important witness for the State, Randy Wolfe. At trial, Wolfe denied receiving or expecting any benefits for his testimony. However, at that time Wolfe was the defendant in a separate criminal prosecution, and the prosecutor admitted at the post-conviction evidentiary hearing that after Browning's trial he told the district judge assigned to Wolfe's case that Wolfe had helped in prosecuting Browning; he also admitted that he later helped Wolfe acquire a job. Though the prosecutor maintained that he acted unilaterally and never made any deal with Wolfe, this information still should have been disclosed to the defense. Under *Brady,* even if the State and a witness have not made an explicit agreement, the State is required to disclose to the defense any evidence implying an agreement or an understanding.[59] The next question is whether there is a reasonable probability of a different result if this information had been disclosed. We conclude the answer is no. Wolfe's credibility was extensively challenged at trial. The jury was made aware that he had initially kept some of the stolen jewelry in this case for himself and lied under oath about doing so. On cross-examination, defense counsel also established that Wolfe had a history of heroin and other illegal drug use and had used heroin just

---

[54]373 U.S. 83.

[55]*Mazzan v. Warden,* 116 Nev. 48, 66, 993 P.2d 25, 36 (2000).

[56]*Id.* at 67, 993 P.2d at 37.

[57]*Id.*

[58]*Id.* at 66, 993 P.2d at 36.

[59]*Jimenez v. State,* 112 Nev. 610, 622, 918 P.2d 687, 694-95 (1996).

four days before testifying, had stolen property and pimped his wife to support his drug use, had three prior felony convictions, and still faced sentencing for one of those convictions. Thus, though the jurors were not told that Wolfe would receive benefits for his testimony, he was stiffly impeached on other grounds. Moreover, strong evidence corroborated his testimony, most notably the discovery of Browning with the stolen jewelry right after the murder. So considering this issue alone, there is not a reasonable probability of a different result if the information in question had been disclosed.

Second, Browning contends that the State withheld the fact, discussed earlier, that bloody shoeprints near the victim were already present when the first police officer arrived at the crime scene. We have already concluded that this information was not material in rejecting Browning's contention that his trial counsel was ineffective. We further conclude that under *Brady* the State did not withhold this information because it was reasonably available to the defense, as Browning acknowledges by claiming that his counsel should have interviewed the officer and discovered it.[60]

Finally, Browning also claims that the State violated *Brady* in regard to the fact, also discussed earlier, that the black police officer, not the white victim, used the term ''jeri-curl'' to describe the perpetrator's hair. Again, the State did not withhold this information because it was reasonably available to the defense.

*Remaining claims*

Browning claims that the State failed to preserve key evidence at the crime scene that had apparent exculpatory value—a shard of glass with blood on it. He asserts that this evidence may have exonerated him because the shard was not near the victim, suggesting that the blood belonged to the actual perpetrator. Because Browning failed to raise this claim on direct appeal, he is required to demonstrate good cause for the failure and actual prejudice. Browning has not offered any good cause for not raising this claim earlier. Nor has he demonstrated prejudice. ''The State's loss or destruction of evidence constitutes a due process violation only if the defendant shows either that the State acted in bad faith or that the defendant suffered undue prejudice and the exculpatory value of the evidence was apparent before it was lost or destroyed.''[61] Browning has shown neither bad faith nor that the evidence had apparent exculpatory value.

---

[60]*See Steese v. State,* 114 Nev. 479, 495, 960 P.2d 321, 331 (1998).

[61]*Leonard v. State,* 117 Nev. 53, 68, 17 P.3d 397, 407 (2001).

Browning asserts that the district court should have granted a new trial under NRS 176.515 based upon the discovery of new evidence—the testimony of Frederick Ross. Ross testified at the evidentiary hearing that a dark-skinned Cuban with a jeri-curl who was associated with Randy Wolfe committed the crimes. Browning claims that this evidence is newly discovered because he did not know that Ross was a witness. NRS 176.515(3) provides that a motion for a new trial based upon newly discovered evidence must be made within two years after the verdict. Browning was convicted in 1987, and it appears that any motion was not timely under NRS 176.515. To raise this issue as a habeas claim, Browning must demonstrate good cause for its untimeliness and actual prejudice. Or absent good cause, Browning must demonstrate that a fundamental miscarriage of justice would occur if this court failed to consider this claim.[62] Browning has shown none of the above. He presented evidence at the post-conviction hearing that on the day of the crimes in 1985 he stood outside a car in which Ross was seated and yet did not observe Ross. Ross testified that he later met Browning in early 1989 when they were in prison together and that he contacted Browning's lawyer in 1992 regarding Browning's innocence. The claim was not raised in Browning's original petition, and the affidavit by Ross that Browning proffered to the district court is dated July 21, 1995. Thus, Browning raised this issue in an untimely manner without apparent good cause. In addition, Ross admitted to numerous felony and misdemeanor convictions, and the record shows that his testimony lacked any credibility. We conclude therefore that Browning has also failed to demonstrate prejudice, let alone a miscarriage of justice.

Finally, Browning claims the district court's continuance of the trial was improper. On direct appeal this court rejected Browning's argument that the continuance violated his constitutional and statutory rights to a speedy trial.[63] He now argues that the continuance violated the procedures dictated by this court's opinions in *Hill v. Sheriff*[64] and *Bustos v. Sheriff*.[65] To the extent that this is a new claim, it should have been raised on direct appeal, and Browning has failed to demonstrate good cause for failing to do so and actual prejudice. To the extent that the claim is not

---

[62]*See Mazzan v. Warden,* 112 Nev. 838, 842, 921 P.2d 920, 922 (1996).

[63]*Browning,* 104 Nev. at 271, 757 P.2d at 352.

[64]85 Nev. 234, 452 P.2d 918 (1969), *limited by Sheriff v. Marcus,* 116 Nev. 188, 995 P.2d 1016 (2000).

[65]87 Nev. 622, 491 P.2d 1279 (1971).

new, the law of the case applies because the claim was considered and rejected on direct appeal.[66]

*Cumulative prejudice*

Several of Browning's claims establish some prejudicial effect: the failure of trial counsel to discover and present the evidence that the victim's description of the perpetrator's hair did not match Browning's hair, counsel's failure to object to the prosecutor's improper statement linking Browning to prostitution, the prosecutor's failure to divulge that Wolfe received benefits for his testimony, and the unfounded inference that the blood on Browning's coat could have been the victim's. The question is: if we consider these factors cumulatively, is there a reasonable probability that Browning would not have been convicted of first-degree murder? We conclude that there is no such reasonable probability. The evidence of Browning's guilt remains overwhelming: his fingerprints at the crime scene, identification by three witnesses placing him at or near the crimes, his admissions of guilt to the Wolfes, and his presence in a hotel room surrounded by the stolen jewelry.

## CONCLUSION

Browning's appellate counsel was ineffective for failing to challenge the aggravating circumstance of depravity of mind because the jury instructions failed to provide the constitutionally required guidance to jurors. Browning's other claims fail. We therefore vacate his death sentence and remand for a new penalty hearing. We otherwise affirm the district court's order denying Browning's petition for post-conviction relief.

---

[66]*See Hall v. State,* 91 Nev. 314, 535 P.2d 797 (1975).